You may proceed. Thank you. Good morning and may it please the court. My name is Paul Alston. I'm appearing for the taxpayer at Malulani Group. Apparently the most senior lawyer in Hawaii. You don't look like the most senior lawyer in Hawaii. I didn't expect or want that recognition this morning. While this case is superficially similar to Taruya Brothers and Okmulgee Fields, in fact, it involves three issues that were not decided in those cases. And when those issues are properly reviewed, it becomes clear, I submit, that this case should be reversed and decided in favor of the taxpayer. And that can be done without doing violence to the general teachings of the Taruya Brothers case, because this case, in fact, involves unique facts. First, in this case, there was no basis-shifting abuse. The congressional history of Section 1031F teaches that Congress was focused on the idea of people basis-shifting. That is, exchanging low basis property for high basis property and then removing the gain from taxation. That did not occur here. In fact, the opposite occurred. What happened was it was the low basis property that was given to the exchanging property, to the taxpayer, and the low basis property that was then subject to tax by the exchanging party. But that distinction doesn't work with regard to Taruya Brothers, does it? Because there, as to one of the properties, there was a basis-shifting, but there was also a carryover loss. And as to the second property, there was no basis-shifting, there was only a copy over. No, there was basis-shifting in Taruya, huge basis-shifting in Taruya. But in Taruya, as to the second property... That was the one as to which there was a $10 million gain as a result of the basis-shifting. My understanding is that with regard to one of the properties, there was a higher basis and also a net operating loss attribution. As to the second, it was only a net operating loss. I believe with respect to the smaller property as well, there was a basis. Similarly, in the Ocean Vista transaction, though Times recognized gain virtually identical to that which Taruya deferred, Times paid no tax due to his net operating loss. Correct. So as to that one, so as to that transaction, on your theory, it should have come out the opposite and it didn't. Well, both those transactions were viewed as a piece in the Taruya brothers' decision. And I think that it was the fact, I'll come to other considerations that are relevant here, but it was the overwhelmingly large transaction that created the huge basis shift that the court found was problematic. The second point, and let me note also that in Taruya brothers, the court noted in footnote 13 that the congressional history showed that the Congress was concerned about basis shifting and noted that Taruya brothers did not argue that there was the absence of basis shifting in that case because, in fact, viewed as a whole with both transactions taken together and the economic unit taken together, they could not make that argument. So here we can and do make that argument. We did before the tax court as well. The theory that there was no basis shifting is what? Well, in the congressional history, it says that the court is focused, said that the Congress was focused on the abuse that's entailed in basis shifting. Right, correct. And what is your reason why there was no basis shifting in this case? In this case, it is because instead of having the low basis property exchanged, it was the high basis property. And what language in Taruya do you think supports that distinction? Just this footnote? No, the footnote notes that the issue wasn't argued, but the court also noted that this is in the middle of, let's see, I don't know the exact pagination in the West Edition, the bottom of page 1045 and the top of 1046. It said here, the changing economic positions of Taruya in times readily showed that the related parties use these exchanges to cash out of an investment in low basis property. But that doesn't mean that high basis property is exempted. That's just stating the facts of this particular case. That's true, but the committee reports reflect the fact that generally, where there is not basis shifting, there is not the kind of abuse that the court, I'm sorry, that Congress was concerned about. I don't think it said that at all. I thought it just gave it as an example. It was an example, but there are other factors as well. I'm not saying that it is this lack of basis shifting alone that justifies overturning the tax court. I'm saying that is one of several factors that justifies it. But are you saying that the tax court should have disregarded the treatment of the net operating losses as between the related companies? No, but I'm saying that the tax court should not have given the dispositive significance that it gave to the treatment of the tax loss. Why not? Because what happened there, well, two things. One is the question under section 1031F is whether tax avoidance is a principal purpose. Here, you had, in fact, the exchanging party, the MIL group benefiting from its tax losses, but what it got was the benefit of that tax losses at a discount because of the impact of the alternative minimum tax, which was triggered. And all it gained was, at most, the acceleration of the use of those NOLs from some later year into 2007. And so, therefore, all we're talking about then is the time value of money, not the existence of the NOLs or the availability of using the NOLs. We're just talking about the time value of money. Didn't MIL get its NOLs fully offset? It has. It did not. It did not by 2007.  of the AMT and, on the other hand, suggest that, wrongly, that MIL could never use the operating losses. In fact, as of now, it's not true. There were transactions which enabled the use of the NOLs. Counsel, in the Turia brothers' case, at the bottom of page 1042, just before footnote 5, the court says, Section 1031F1 largely precludes the non-recognition treatment of gain or loss when a taxpayer exchanges like-kind property with a related person and when either party then disposes of the exchanged property within two years. What are we to make of that language in terms of your argument that your factual situation can be distinguished? Because Congress indicated that it was where there was some abuse going on and the exchange and the transaction were motivated by—were resulted in a—were motivated by a tax avoidance purpose and here—and where there had to be, under 1031F4, a structure, a pre-planned structure. Here, unlike in Turia, unlike in Okmulgee, the tax court found that the structure that involved the exchange of related parties was not set—was not set with any related party in mind. That structure was created at a time when the taxpayer intended to engage in an exchange with an independent party and the concept of engaging in an exchange with a related party came into being only after the structure had been set, only after the exchange property had been—the initial property had been sold and the funds were in the hands of the accommodator. Then as the designation period was running out, at the very end of that period, did the concept of exchanging with a related party come into being? And so it wasn't— So is it your argument that we are to read all of that into this pretty clear language that the court— Yes, Your Honor, because that's in fact what Turia teaches. Turia teaches that you look at all the subparts of 1031-F to figure out whether the taxpayer is engaged in some sort of tax avoidance motivated abuse. Right, but didn't the tax court say that was irrelevant and that it previously held that whether or not there was a prearranged plan was really irrelevant, that what you needed to do was focus on the actual tax consequences of the arrangement? And here, the actual tax consequences was to diminish taxes paid as an economic unit between the related entities. Yes, it— You're saying it's wrong because why? What case? There is no—the cases we have are Okmulgee and Turia, and now we have this case. And this case differs from Turia and it differs from Okmulgee because we have no preplanned structure where the taxpayer intended to go into an exchange with a related party. They intended to do the opposite. And then when their efforts to find an exchange with an unrelated party failed and as the designation period was coming to a close, they were forced into doing— That was true in at least one of the other cases too, right? No, not so. In Turia, the exchange with the related party was planned months in advance. In Okmulgee— But not in the other case. In Okmulgee, what happens is they designate the accommodator, and then six days later, they have fixed on the idea that they're going to do the exchange with the related and then they move forward. This is the opposite. Here, the tax court found that as of the time of the closing of the initial sale to the unrelated party, they had not—no one had conceived the idea of doing an exchange with a related party. That comes up only at the end as time is running out and they need some exchange. And at that point, they exchange not low basis for high basis, but high basis for low basis. And it's true that they are able to use NOLs to avoid the immediate taxation, but as the court noted in footnote 12 in the Turia case, the issue of the tax cost of using the NOLs was not argued by the taxpayer in Turia. That seems to be your strongest issue, but the problem seems to be that there is nothing in the record to suggest that this was really a viable company that would ever make a profit. Is that right? Well, I don't think that's true. I think the record reflects—there are minutes that are part of the record that shows as early as the beginning of 2007, NOL is selling property and closing escrows and paying off debt so that there was, in fact, evidence of economic activity. And as I said, the government speculates that the NOLs would never have been used, but that's not only inappropriate speculation, but actually wrong. I'd like to reserve the remaining minute of my time for rebuttal. Thank you. May it please the Court, Richard Farber for the Commissioner. I think it's important to get back to what 1031 was intended to do and why this transaction, as the tax court found, violates the related party provisions of 1031F. 1031 was designed to allow a taxpayer to defer paying tax on gain realized on exchange of property on the theory that he hasn't cashed out his investment, he's continuing it through different property, and so the tax is deferred until he disposes of that exchange property. What Congress was concerned with was that related parties were actually cashing out. The taxpayer itself wasn't getting the proceeds, the related party was. Right, but then it didn't, I mean, the reason I have a hard time when dealing with these tax transactions and which ones are unduly manipulative is that they're all manipulative. I mean, the statute is set up to be manipulative, right? In that it allows, for example, for this third-party situation, and it doesn't apply the third-party situation to the related parties for some reason. So, I mean, that's the basic problem, is that when you have, because if this had been a direct transaction with the related parties, it would be subject to the two-year rule, but it wasn't one, and the, as long as, so as long as you have a third-party involved, the prohibition on related parties doesn't apply. That's not correct, Your Honor. Well, it is correct, except for this caveat that you can't, that it can't be to avoid the taxes. It's not quite what the statute says. Congress first said, you know, we know related parties are cashing out, but in a direct exchange, because they exchange property, and then the related party sells the property, and then there's deferral, even though one of the properties is cashed out. Congress enacted Section 1031F4 to prevent parties from reaching that exact same result by using a qualified intermediary. So if you compare what would have happened here— First, it allowed qualified intermediaries in general, with regard to these kinds of transactions, right? And then, and it didn't apply the prohibition to the situation where you had a qualified— If the statute says F4, if you engage, and there's nothing about pre-plan, that's not in the statute, nor is basis shifting in any statute. Those are just examples that Congress gave. The statute says any exchange, which is part of a transaction, or a series of transactions, structured to avoid the purposes of Subpart F, won't qualify for 1031 treatment unless— Well, that's all the statute says, but the courts have said the safe harbor provision of F2, which technically only applies to direct exchanges, also applies to the structuring transaction. The relevant safe harbor is, even if you engage in this transaction, and you structure it to avoid the purposes, and this court focused in Taroya, what does that mean? What is the purpose of Section 1031F? The purpose is to prevent related parties from cashing out an investment where one property is disposed of, the proceeds wind up in the hands of a related party, and yet they defer gain under 1031. That's exactly what happened here. First of all, what I said is absolutely correct or remains correct, so we shouldn't— I'm sorry. But leaving that aside, it seems to me that the hard question here is the one that was left open in the footnote in Taroya, because Taroya is similar in that you have the carryback losses, but it says that maybe that's different because there's a tax loss here. And the question is, what do you do with that? I mean, what would you have to show with regard to whether that— Presumably, it has value, some kind of value to some people, depending on the state of the company and whether it would actually use them. So, are you saying that this loss thing would always apply or only apply here or what? First, I would like to point out that 1031 itself, if you qualify for it, it's not a tax exemption. It's just tax deferral. So, the only reason 1031 has value to a taxpayer is the time value of money. In other words, if you can defer paying your million-dollar tax liability for 10 years, you've profited through the time value of money. So, now we get to the NOLs. We have the situation here, and as the tax court found, the taxpayer was well aware of these NOLs. They would have been foolish not to because without the NOLs, the Hawaii Corporation would have paid more in tax than was saved by using 1031. And the court found that they were aware of it, that Mr. Uehling was on the note committee, and they reviewed this financial information. So, we're talking about the time value of money. We had trial—the taxable year is 2007. They had NOLs in that year that wiped out all the regular tax. When you have an NOL, you first have to carry it back two years, 2005-2006. Those were already closed in the tax court, which trial was 2013. They didn't claim they could have used those NOLs in those years. We also had the other years closed, 8, 9, 10, 11, 12, were all closed. They didn't put on any evidence that there was any income that had they not used the NOLs in 2007, they could have used them. So, it may well be, as my opponent says, at some point this year, next year, I think you have 20 years, 2027, that they'll be able to use those— would have been able to use those NOLs, but— Is your position that that matters or doesn't matter? Doesn't matter because there's the time value of those NOLs. If you defer it, you know, 20 years from now, that's not nearly as valuable as saving your tax now. So, that doesn't negate a tax avoidance. Even if they're giving up the possible right to save taxes 10, 15 years later, it's much more valuable to save the tax now than possibly save the same tax years later. That's the whole concept of 1031. You don't get to avoid the tax, you get to defer it, and that's value only because of time value of money. I can assure you, if MIL had income in the carryback years that would have used those NOLs, they never would have done this deal because that's more valuable to use those NOLs in 2005 and 2006 than to use it in 2007. And what about the fact that they— this wasn't seemed to be prearranged, that they had the property on the market for a third party? It—the court found that at the time they— No, the court found— In October 2006, when they got an offer from someone wanting to buy Maryland, they started to look for replacement property. They were going to do an unrelated party deal. And they said this continued until they had 45 days to do it or they would get the proceeds and have to pay the tax. So, at some point near the end, lo and behold, they finally found three properties all owned by their own subsidiary corporation and they decided to do the deal. But when they did the deal with a related party as opposed to an unrelated party, they produced a transaction in economic consequence, which is exactly the same as if they had just done a direct exchange with MIL and MIL had sold the Maryland property. If they had sold to the third party, would they have had to realize the tax consequences then and there? If they sold it, if they did an exchange with an unrelated party, they would never— there wouldn't have been any cash proceeds going to anybody. They would have new property and they'd have a carryover basis. And that would not be recognized? No. But what happened was when they finally decided to do a deal with a related party, they cashed out—the unrelated buyer paid cash for the Maryland property. That cash wound up in MIL, a related party. As Taroya holds, that's the same as if the taxpayer got the proceeds because you have to look at it as an economic unit. Or looking at it differently, before this transaction and issue, the economic unit owned the Maryland property and the Hawaii property. After the transaction, they only owned the Hawaii property and the proceeds from the disposition of the Maryland property was in MIL's hands. That defeats the purposes of F-2, which is to prevent parties from cashing out and using 1031. But there is one safe harbor. F-2 provides a safe harbor. Even though they had cashed out, the same as if there's a direct exchange and property is disposed of within two years, there's still the safe harbor. You still can use 1031 if you meet this final test, which is to establish that tax avoidance was not one of the principal purposes. The court found they failed to meet that burden. That's a finding of fact. And they haven't shown it's clearly erroneous. In fact, if you look at the transcript, they have never given a non-tax reason for going ahead with the related party exchange when they couldn't do an unrelated party exchange. What the testimony was, time was running out, we wanted to use 1031, which is tax avoidance, so we went ahead with it. They never said there was any benefit to becoming the direct owner of the Hawaii property when they were already the controlling owner of it through their 70% voting control of MIL. They never said that. All they said was we wanted to take advantage of 1031. That's a tax reason. And in terms of what did they accomplish, they accomplished a tax savings of $600,000 looking at the economic unit, because although Hawaii realized this $3 million gain, that would have been a million-dollar tax bill, they wiped that out with NOLs, of which they are well aware, and they were left with a tax bill of $44,000 for alternative minimum tax. On the other hand, the taxpayer avoided $670,000. So together, the economic unit saved $630,000 in a transaction that made no sense other than to save that $630,000. There was no benefit to doing the related party exchange other than they didn't want to pay the tax that was on the gain that was realized on the disposition of the Maryland property. And that's what these provisions are aimed at. There's really no difference between this and Taroya. In the first transaction in Taroya, the related party's recognized gain was actually slightly bigger than the gain the taxpayer deferred, but the related party had NOLs and wiped it out, so the tax savings for the group was the amount of tax that would have been due from the taxpayer. It's the same thing here. MIL had recognized gains much bigger than the taxpayer ceased to defer, but because of the NOLs, the economic unit saved $660,000. It might be 10 years from now or something, MIL might owe additional taxes, but because of the time value of money, that's insufficient to negate the court's finding that tax avoidance was a principal purpose for going ahead with a related party transaction. Under the exchange agreement, the taxpayer was entitled to get these proceeds back in its hands at the expiration of the 45-day period for identifying properties if no properties were identified. So if they had just let that 45-day period expire, they would have gotten the proceeds. Instead, they went ahead because they knew it was going to save them $600,000. This is what these provisions are designed to prevent. There's really no difference between this case, Akmolgi, and Taroya. There's a cashing out by related parties of property with the proceeds winding up in the hands of a related party. The fact they use NOLs to produce the tax avoidance rather than basic shifting is not relevant under the statute or the case law. In fact, in Akmolgi, the tax avoidance was because they shifted the incidence to a related party who was subject to tax at 15% as opposed to 34% that the taxpayer was subject to. There's numerous ways that related parties can save taxes and basis shifting is only one example and it's hardly controlling if that wasn't the way they save taxes as an economic unit here. The court has no further questions. I would submit the court should affirm the tax court. All right. Thank you, counsel. Judge Rawlinson, let me go back, if I could, to one question you asked about the language in section 1031F1C2, which talks about the taxpayer doing a direct exchange with a related party. That is not triggered here because of the intermediary. What's triggered and the way into the exceptions to 1031 is 1031F4, which is the structuring. And here, as we've argued, there was no preplanned structure as there was in Teruya. There was no structure before the initial closing occurred as there was in Okmulgee. Here, all that happens is that the taxpayer has run out of time to designate the exchange property. They need to designate exchange property and they do it with the related party, not because they've set out to do it as part of a structure to avoid taxes, but because of the exigencies created by the inability to find other unrelated exchange property. All right. Thank you, counsel.
judges: Wardlaw, Berzon, Rawlinson